IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIAN BRADLEY | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| AMAZON.COM, INC et al. | : | NO.   17-1587 |
| | : | |

## <u>MEMORANDUM OPINION</u>

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    March 17, 2023

  This case arises from Plaintiff, Julian Bradley's ("Plaintiff" or "Bradley"), allegation that he was injured by a portable phone charger ("Product") sold through Defendant Amazon.com, Inc.'s ("Defendant" or "Amazon") website. Bradley seeks damages related to his injuries sustained from the Product's alleged malfunctioning from Defendants (collectively "Defendants") Amazon and Searay LLC ("Searay"). Pending now before the Court are: Amazon's "motion to exclude Gary Smullin" (Doc. 190); Bradley's "motion to preclude Kevin C. White, Ph.D. from testifying" (Doc. 185); Amazon's "motion to strike the July 15, 2022 Expert Report of Neil Shirk" (Doc. 182); Amazon's "motion to exclude Neil Shirk" (Doc. 195); Amazon's letter to the Court requesting the court strike the Supplemental Report of Neil Shirk (not on the docket); Amazon's "motion to exclude Mark Willingham" (Doc. 191); and Amazon's "motion to exclude Andrew Verzilli." (Doc. 189.)

Bradley and Amazon have filed opposition and reply briefs for each motion.[1]  In this omnibus opinion, we address separately each of these six motions and the additional letter briefing on the motion to strike the supplemental expert report.

**Contents**

I.    BACKGROUND .................................................................................................... 3

  A.   Proffered Experts ............................................................................................ 4

  B.   Relevant Procedural History .......................................................................... 4

II.   LEGAL STANDARDS ........................................................................................ 6

  A.   Motion to Exclude........................................................................................... 6

  B.   Motion to Strike ............................................................................................ 10

III.  DISCUSSION .................................................................................................... 13

  A.   Amazon's "motion to exclude Gary Smullin" (Doc. 190)................................ 13

    i.   Qualification ............................................................................................. 13

    ii.  Reliability ................................................................................................. 16

  B.   Bradley's "motion to preclude Kevin C. White, Ph.D. from testifying" (Doc. 185)......... 19

    i.   Qualification ............................................................................................. 20

    ii.  Reliability ................................................................................................. 21

    iii. Relevance ................................................................................................. 25

  C.   Amazon's "motion to strike the July 15, 2022 Expert Report of Neil Shirk" (Doc. 182) . 27

  D.   Amazon's "motion to exclude Neil Shirk" (Doc. 195)..................................... 34

  E.   Amazon's letter brief to strike the Shirk Supplemental Report ........................ 34

  F.   Amazon's "motion to exclude Mark Willingham" (Doc. 191)........................... 35

    i.   Qualification ............................................................................................. 35

    ii.  Reliability ................................................................................................. 38

---

[1] We note that Searay did not submit any arguments in support of or in opposition to any of Amazon's motions.

G.   Amazon's "motion to exclude Andrew Verzilli" (Doc. 189) ........................................... 42

   i.   Wage Loss Opinion ....................................................................................... 42

   ii.   Medical Cost Opinion ................................................................................... 45

IV.   CONCLUSION ........................................................................................................... 46

## I.   BACKGROUND

As we write for the parties, to whom the relevant facts and circumstances of these motions are well known, we provide here only a brief statement of relevant background information. This litigation arises out of Bradley's allegation that he was injured by a portable phone charger[2] sold through Amazon's website. In preparation for trial, the parties engaged in an extensive discovery period that included the exchange of expert reports and the taking of expert depositions. The parties have each retained several experts in this case, many of whom have been subject to *Daubert*

---

[2]   Critically, we highlight the fact that Amazon, Bradley, and their proffered experts use the term "charger" in different ways. This footnote seeks to clarify the nomenclature used in this opinion at the at the outset. The product at issue is the Powerbank ICHOC-5000. It is a portable cell phone charger, designed to let a user charge their cell phone without the need for an electrical outlet. The Powerbank ICHOC-5000 is powered by a rechargeable lithium-ion battery and connects to a cell phone's charging cable via a USB port.

   We define the term "Product" to mean the product that we will be discussing here, the Powerbank ICHOC-5000. Amazon defines the term "Charger" to mean the product we are discussing. Confusingly, Bradley also defines the term "Charger" to mean the product we are discussing, but then sometimes uses the terms "charger" and "battery." (*See* Doc. 196 at 5.) Bradley states that the "charger" is the component designed to charge the lithium-ion "battery," inferring that they are two distinct components, but does not provide any additional explanation. (*Id.* at 10.) Based on the foregoing, the Court's understanding is that when Plaintiff and Defendant use the defined term "Charger," they mean the product we are discussing. When Plaintiff uses the words "charger" and "battery" he refers to components located within the Product, but not the Product as a whole. (*See id.* at 5.)

attacks.

### A.  Proffered Experts

Bradley has proffered the reports of four experts that are currently being challenged by Amazon: Gary Smullin, P.E. (electrical engineer); Neil Shirk, M.S. (electrical engineer); Mark Willingham (modeling industry professional); and Andrew Verzilli, M.B.A. (economist). Amazon has proffered the report of one expert who is currently being challenged by Bradley: Kevin C. White, Ph.D. (electrochemist).

### B.  Relevant Procedural History

During expert discovery, Bradley was required to produce his expert reports by May 9, 2022. (Doc. 170.) Bradley complied with this deadline by disclosing five experts, including Ronald Panunto, P.E. ("Panunto")[3], Andrew Verzilli, M.B.A. ("Verzilli"), Gary Smullin, P.E. ("Smullin"), and Mark Willingham ("Willingham") but he did not disclose Neil Shirk ("Shirk") at that time. (Doc. 182-1 at 1.)   Amazon was required to produce its expert reports by June 24, 2022. (Doc. 170.) In accordance with this requirement, Amazon disclosed Kevin White, Ph.D. ("White") as one of its experts and submitted White's report on that date.[4]   (Doc. 182-1 at 1-2.) Bradley

---

[3]  Panunto "passed away before any party was afforded the opportunity to depose him." (Doc. 184 at 1.)

[4]  According to Amazon's June 24, 2022, Expert Disclosure Pursuant to FRCP 26(a)(2), Amazon retained four other experts against whom Bradley did not file *Daubert* motions. They are Daniel D. Lozano, M.D., M.B.A., FACS, CPE; Chad L. Staller, J.D., M.B.A., M.A.C., C.V.A.; Stephen M. Dripps, M.Fin. C.V.A.; and Ramon Lata. (Doc. 205-2.)

deposed White almost a month later, on July 21, 2022. (*Id*. at 2.) Bradley was then required to submit his rebuttal reports no later than July 27, 2022. (Doc. 179.) On July 22, 2022, the day after White's deposition, Bradley served Amazon with a rebuttal report by Shirk, which purportedly responds to the conclusions in White's report and expands upon the opinions in Panunto and Smullin's reports.[5] (Doc. 182-1 at 2.)  Amazon moved to strike the Shirk report on the grounds that it was an impermissible rebuttal report. (*Id*. at 1.) The Court, until now, deferred judgment on the motion to strike, and the Bradley's response in opposition thereto. (Doc. 186.)

Amazon also moved to exclude Smullin, Willingham and Verzilli. (Docs. 190, 191, 189.) Bradley filed timely responses in opposition those motions (Docs. 196, 198, 197), to which Amazon replied. (Docs. 209, 211, 206.)

Additionally, Amazon filed a motion to exclude Shirk on September 2, 2022. (Doc. 195.) That same day, Amazon was served with an *additional* report authored by Shirk ("Shirk Supplemental Report") which included additional analysis and opinions about the incident. (September 28, 2022 Undocketed Letter to the Court.) On September 6, 2022, Amazon notified the Court of its intent to strike the Shirk Supplemental Report and we held an unrecorded telephonic conference on the matter. (Doc. 207.) The Court asked Amazon to submit supplemental briefing outlining its position as to why the Shirk Supplemental Report should be excluded. (Doc. 207.) It did so. Bradley

---

[5] Amazon notes that Shirk's rebuttal report was dated July 15, 2022, which was almost a week before White was deposed. (Doc. 182-1 at 2.)

5

responded in opposition thereto.[6] (Doc. 214.)

## II.   LEGAL STANDARDS

### A.  Motion to Exclude

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and was "amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and to the many cases applying *Daubert*, including *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999)." Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments. In *Daubert*, the Supreme Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science." *Id.*   The amended rule provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. The Third Circuit has "explained that 'Rule 702 has three major requirements:

---

[6] Amazon's letter was not docketed.

(1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [,*i.e.*, reliability]; and (3) the expert's testimony must assist the trier of fact [,*i.e.*, fit]." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)) (alterations in original). The trial court "acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Schiff*, 602 F.3d at 172 (internal citation omitted). To that end, "the trial judge evaluates its admissibility based on these three requirements." *Id.* The burden is on the proponent of the expert testimony to establish "by a preponderance of proof" that each requirement is satisfied. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10).

With respect to the first admissibility requirement, an expert is "qualified" if "the witness possess[es] specialized expertise." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has "interpreted this requirement liberally, holding that 'a broad range of knowledge, skills, and training qualify an expert.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). Accordingly, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). At a minimum, however, "a proffered expert witness must possess skill or knowledge greater than the average layman." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002)

(internal quotations, citations, and alterations omitted).

The second requirement of Fed.R.Evid. 702 is that "the process or technique the expert used in formulating the opinion is reliable." *Paoli*, 35 F.3d at 742. To meet the reliability standard, the proffered testimony must "be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80–81 (3d Cir. 2017) (quoting *In re TMI Litig.*, 193 F.3d 613, 703–04 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (internal quotations omitted). "'The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.' Instead, the court looks to whether the expert's testimony is supported by 'good grounds.'" *Id.* at 81 (quoting *TMI*, 193 F.3d at 665); *see also Paoli*, 35 F.3d at 742 (explaining that there may be good grounds "even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result."). "The standard for reliability is 'not that high.'" *Karlo*, 849 F.3d at 81 (quoting *TMI*, 193 F.3d at 665). It is "lower than merits standard of correctness," *id.*, but it is "higher than bare relevance." *Paoli*, 35 F.3d at 744. "As long as an expert's scientific testimony rests upon good grounds it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) (internal citation and quotations omitted).

The Third Circuit has set out several factors that trial courts may consider in determining

whether a particular methodology is reliable, including:

> whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda*, 520 F.3d at 247–48 (citing *Paoli*, 35 F.3d at 742 n.8). These factors, however, "are neither exhaustive nor applicable in every case." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806–07 (3d Cir. 1997). Testimony on technical or other specialized subjects, for example, "forensic engineering evaluations," may not "fit neatly" within the elements listed in *Paoli. See Pineda*, 520 F.3d at 248; *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 329 (E.D. Pa. 2015). Rather, "[t]he inquiry envisioned by Rule 702 is a flexible one." *Id.* (quoting *Daubert*, 509 U.S. at 594) (internal quotations and alterations omitted).

The "fit" requirement ensures that there is a sufficient nexus "between the expert's testimony and the facts that the jury is being asked to consider." *Schiff*, 602 F.3d at 173 (citing *Daubert*, 509 U.S. at 591). The testimony must be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Id.*; *see also TMI*, 193 F.3d at 663 (quoting Fed.R.Evid. 702(a)) (evidence or testimony "fits" where it "[helps] the trier of fact to understand the evidence or to determine a fact in issue") (alteration in original). "Put another way, [the fit requirement] is a question of relevance, and Rule 702 has a liberal policy of admissibility if [expert testimony] has the potential for assisting the trier of fact." *Schiff*, 602 F.3d at 173 (internal citations

and quotations omitted). Like the reliability prong, the fit standard "is not that high," but "is higher than bare relevance." *Paoli*, 35 F.3d at 745.

Finally, we note that, in general Fed.R.Evid. 702 has a "liberal policy of admissibility," *Pineda*, 520 F.3d at 243, and that, as such, the "rejection of expert testimony is the exception and not the rule." Fed.R.Evid. 702, Advisory Committee Note, 2000 Amendments. In determining whether to admit expert testimony, we do "not weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein." *Walker v. Gordon*, 46 Fed.Appx. 691, 695 (3d Cir. 2002). Rather, "the credibility and weight of [the expert] testimony is to be determined by the jury, not the trial judge." *Id.* (internal citation and quotations omitted); *see also Daubert*, 509 U.S., at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").[7]

### B. Motion to Strike

Federal Rule of Civil Procedure 26(a)(2) requires the disclosure of expert testimony and

---

[7] The Court is not required to decide all *Daubert* issues presented at this stage of litigation. *See SRP Mgmt. Corp. v. Seneca Ins. Co.*, 2008 WL 706962 at *2 (E.D. Pa. Mar. 14, 2008) (Strawbridge, Mag. J.) (quoting Clark v. Richman, 339 F.Supp. 631, 648-49 (M.D. Pa. 2004)) ("Within the context of trial, [the court] will hear testimony and argument as necessary on the issues presented in this motion and rule as appropriate at that time. Indeed, as the court has noted … 'vigorous cross-examination and presentation of contrary evidence will provide the best means' of determining the extent to which [the expert's] opinion should be considered in this matter.").

mandates that "this disclosure must be accompanied by a written report," which includes:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi). Further, "[a] party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

During expert discovery, "a party may only submit an expert rebuttal if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party." *In re Asbestos Prod. Liab. Litig.* (No. VI), No. 09-CV-74351X, 2012 WL 661673, at *1 (E.D. Pa. Feb. 8, 2012), *report and recommendation adopted sub nom. In re Asbestos Prod. Liab. Litig.* (No. IV), No. 09-74410, 2012 WL 661660 (E.D. Pa. Feb. 29, 2012) (quoting Fed. R. Civ. Pro. 26(a)(2)(c)). A rebuttal report is also permissible if it contains "an elaboration of and is consistent with an opinion/issue previously addressed in the expert report," but should be stricken "if it contains new opinions or information which is contradictory to that set forth in first expert's first report." *Fulton Fin. Advisors v. Natcity Invs., Inc.*, No. CV 09-4855, 2016 WL 5461897, at

*2 (E.D. Pa. Sept. 28, 2016) (quoting *Pritchard v. Dow Agro Scis*., 263 F.R.D. 277, 285 (W.D. Pa. 2009)). The trial court has the discretion to "limit rebuttal testimony to only that which rebuts new matters or opinions presented by the […] case-in-chief." *In re Asbestos Prod. Liab. Litig*. (No. VI), No. 09-CV-74351X, 2012 WL 661673, at *1 (citing *Upshur v. Shepherd*, 538 F. Supp. 1176, 1180 (E.D. Pa. 1982); *aff'd* 707 F.2d 1396 (3d Cir. 1983)). "It is well settled that evidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected so as to avoid prejudice to the defendant and to ensure the orderly presentation of proof." *Id*. (citing *Emerick v. U.S. Suzuki Motor Corp*., 750 F.2d 19, 22 (3d Cir. 1984)).

Federal Rule of Civil Procedure 37 provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Nevertheless, "[t]he exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Konstantopoulos v. Westvaco Corp*., 112 F.3d 710, 719 (3d Cir. 1997). The Third Circuit has set out five factors that trial courts may consider in determining whether exclusion of evidence or a witness is appropriate:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing

12

to comply with the court's order; and (5) the importance of the
excluded evidence.

*ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254, 298 (3d. Cir. 2012) (internal citations and

quotations omitted). We are mindful that "[t]he importance of the evidence is often the most

significant factor." *Id*. Further, "[t]he non-producing party shoulders the burden of proving

substantial justification for its conduct or that the failure to produce was harmless." *Klatch-*

*Maynard v. Sugarloaf Twp*., 2011 WL 2006424, at *2 (M.D. Pa. May 23, 2011) (internal

quotations and citations omitted).

## III.    DISCUSSION

### A.  Amazon's "motion to exclude Gary Smullin" (Doc. 190)

Plaintiff retained Gary Smullin, P.E., to "render an opinion on the apparent safety hazard" of

the Product.[8] (Doc. 190-4, Def. Ex. B at 4.) Amazon argues that Smullin (1) lacks qualifications

to opine on lithium-ion batteries and (2) that his opinions are neither based on sufficient facts or

data nor were they the product of any reliable methodology. (Doc. 190-2 at 16, 19).

### i.  Qualification

First, Amazon argues that Smullin is unqualified to opine on lithium-ion batteries, in part,

because he "does not even know how they work." (*Id.* at 7.) Amazon asserts that "Smullin does

not have the required skills, education, training, and experience to offer design, manufacture,

warning or recall opinions regarding the lithium-ion Charger." (*Id*. at 17.) He has "no experience

---

[8] Smullin himself defines the term "POWERBANK" to mean the Product.

in the design, manufacture, or failure analysis of lithium-ion battery products, has never written or presented on any such devices in any setting, and lacks even the most basic knowledge of the specific causes of thermal runaway." (*Id*. at 18.)

Defendant concedes that Smullin possesses general engineering expertise in power networks and distribution systems in industrial and commercial settings but alleges that he has no education or experience with consumer products, specifically a lithium-ion battery products. (*Id* at 7.) His only experience with lithium-ion batteries is as a "user." (*Id*.) He admitted he did not know certain "basic" facts relating to these batteries, including, how they are made and what their four basic components are. (Doc. 190-5, Def. Ex. C, Smullin Dep. 59:18-21; 64:20-65:1.)

Further, Amazon takes issue with the fact Smullin opines on the sufficiency of warnings but is not a human factors expert and has never "drafted, reviewed, or approved any warnings for lithium-ion battery products, and he admitted to having no expertise in any regulations, laws, or guidelines applicable to lithium-ion battery products." (Doc. 190-2 at 8-9.)

In response, Bradley classifies Amazon's motion to exclude Smullin as "a disingenuous attempt to deprive Plaintiff of a liability expert." (Doc. 196 at 5.)  Plaintiff contends that this litigation will "showcase a duel of the experts" and it would cause "manifest injustice" to exclude Smullin. (*Id.* at 5-6.) He argues Smullin's limited knowledge about batteries is irrelevant because Plaintiff "places blame for the incident on the charger" instead of "the battery" like Amazon does. (*Id.* at 5.) Smullin asserts that "a product having catastrophically malfunctioned during the warranty period is indicative of a design or manufacturing defect." (*Id.*)

In regard to warnings, Plaintiff argues that based off of Smullin's experience "drafting warnings for commercial and industrial electrical products," he is qualified to opine on warnings in this context. (*Id.* at 6.) Smullin himself testified that "[r]elated to electrical work, I might be considered an expert [Human Factors] on that, having many years of experience with safety programs and procedures and the application and maintenance of safety equipment." (Doc. 190-5, Def. Ex. C, Smullin Dep. 54:1-6.)

This is a close call, but we ultimately find that Smullin is qualified. Indeed, while an expert must possess "specialized expertise" to be qualified as an expert, this requirement has been "interpreted liberally," with the Third Circuit holding that "a broad range of knowledge, skills, and training qualify an expert." *Paoli*, 35 F.3d at 741. "At a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal citations, quotations, and alterations omitted). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril*, 128 F.3d at 809.

Here, Smullin barely clears the minimum qualifications required to testify about the cause of the Product's malfunction and the sufficiency of the warnings. We find Smullin qualified because Plaintiff's theory of the case rests upon electrical circuitry being the cause of the Product's malfunction and Smullin has been certified as an electrical engineer since 1974. He has a bachelor's degree in electrical engineering and is a registered professional engineer. He has "many years" experience in the electrical and power industries, including specifically experience with

safety procedures and warnings.

We acknowledge Defendant's point that Smullin admitted he was not a human factors expert when he stated in his deposition, "I *might* be considered an expert on that." (Doc. 190-5, Def. Ex. C, Smullin Dep. 54:1-6) (emphasis added.) We also acknowledge that Smullin's expertise and experience is not in consumer products but instead in industrial settings. However, we are reminded that the "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook,* 80 F.3d at 782. Smullin's professional training and experience may not be directly on point for the product at issue in this case, but it certainly is related enough to Plaintiff's theory of causation such that Smullin "possess[es] skill or knowledge greater than the average layman" on electrical circuitry and related warnings. *Betterbox Commc'ns Ltd.,* 300 F.3d at 328 (internal quotations, citations, and alterations omitted). Accordingly, Smullin is qualified under the liberal standard set forth in Rule 702.

### ii.  Reliability

Second, Amazon argues Smullin's opinions were not based on sufficient facts or data or on any reliable methodology. (Doc. 190-2 at 19.) He "does not know the type of faults in the manufacturing process that could cause performance issues or thermal runway in a lithium-ion battery, is not aware of any such faults or imperfections in the Charger and does not know how or why such a scenario would occur." (*Id*.)  Defendant notes that despite not knowing about such things, Smullin did not review any literature, studies, or treatises to learn and instead relied on the

instructions from the charger itself. (*Id.* at 9-10, 20.)

Amazon continues that, despite being unable to identify a defect, Smullin opined that the Product should have been recalled. In coming to this conclusion, Smullin "does not rely on any specific engineering principles or other area of specialized knowledge" and is instead based on "common sense and his personal experience." (*Id.* at 14; Doc. 190-5, Def, Ex. C, Smullin Dep. 194:11-17.) He "conducted no analysis of the charger beyond a cursory visual inspection and reading the written instructions."[9] (Doc. 190-2 at 20.)

To generate his report, Smullin examined the Product and its instructions, deposition testimony, and Panunto's May 2017 report. (Doc. 190-4, Def. Ex. B, at 6-8.)   Smullin begins his report by highlighting that at the time of the incident, the Product was only nine months old and was still under warranty. (*Id.* at 5.) He states that it experienced "infantile failure" as it "failed to survive any reasonable amount of time under normal use." (*Id.*) He asserts "[c]atastrophic failures of products, known to cause personal injury, should be recalled." (*Id.*) Smullin continues that:

> Lithium batteries are subject to catastrophic failure because they are very efficient
> in storing a large amount of electrochemical energy in a relatively small/compact
> device. They have a very high energy-to-weight ratio. However, Lithium batteries
> also present many safety hazards which must be understood, accommodated, and
> the user forewarned of failure modes and their severity.

---

[9] In its reply, Amazon argues that its motion is unopposed and under Local Rule of Civil Procedure 7.1(c) because Bradley failed to address Amazon's arguments in its reply. As such, Amazon contends that its motion to exclude Smullin should be granted on this basis. (Doc. 209 at 2.) We disagree. *See* E.D. Pa. Civ. R. 7.1(c) ("In the absence of timely response [fourteen days after service of the motion], the motion may be granted as uncontested[.]").

(*Id.*) Smullin generated four opinions:

1. Defendants failed to provide the product, POWERBANK, with a functioning feature offering protection from failing catastrophically under normal use, which was inconsistent with published instructions to the user.

2. Defendants failed to provide the product, POWERBANK, with appropriate instructions warning the user of the propensity of its battery packs to malfunction and self-ignite and the associated severity causing personal burn injury or death.

3. Defendants' instructions to the user are misleading by describing a product with self-protection or fail-safe features

4. Defendants continued manufacturing, marketing, and selling POWERBANK to the public after full knowledge of incident reports of catastrophic failures and personal injury litigation action. To my knowledge, there was no recall attempt to contact and alert the purchasers of the subject product.

(*Id.* at 11.) While we agree with Amazon that Smullin's methodology has flaws, we do not find the flaws in his analysis fatal to the admissibility of his opinion. Defendant emphasizes that Smullin admitted to relying on common sense in forming his opinion and that therefore it cannot be the product of a reliable methodology. We gave this argument credence, but ultimately found that an expert's own purported "common sense" in an area of their expertise is necessarily informed by their own skill and knowledge in their field. To the extent that Amazon disputes the accuracy of Smullin's opinions, it has articulated a challenge to the weight of his opinion, not its admissibility. *See Walker,* 46 F. App'x at 695–96 ("An expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury."). The quality of Smullin's review and the methods he employed in coming to his opinions

18

can be probed on cross-examination. We must look only to whether the expert's testimony is supported by 'good grounds.'" *Karlo*, 849 F.3d at 81 (internal citation and quotations omitted); *see also Paoli*, 35 F.3d at 742 (explaining that there may be good grounds "even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").

We are reminded that "[t]he standard for reliability is 'not that high.'" *Karlo*, 849 F.3d at 81 (quoting *TMI*, 193 F.3d at 665). It is "lower than merits standard of correctness," *id.*, but it is "higher than bare relevance." *Paoli*, 35 F.3d at 744. Accordingly, we conclude that there is a sufficient factual basis for Smullin's opinions and they may be challenged on cross examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Stecyk*, 295 F.3d at 415 n.3 ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."). We therefore conclude, in accordance with the liberal admissibility standards embodied in Fed.R.Evid. 702, that Smullin has "good grounds" for his opinion which could be seriously tested by the adversary process.

### B. Bradley's "motion to preclude Kevin C. White, Ph.D. from testifying" (Doc. 185)

Amazon proffered White as an "expert who specializes in electrochemistry and its application to battery systems." (Doc. 205 at 5.) He was retained to "assess the remains of a

POWERBANK ICHOC-5000 battery pack that was involved in an over-temperature event."

(Doc. 205-3, Def. Ex. B, at 7.)   Plaintiff asserts that there are three bases for excluding White's

opinions. Bradley claims White is (1) not qualified in this matter, (2) not reliable, and (3) his

opinion is prejudicial. (Doc. 185.)

### i. Qualification

First, Plaintiff contends that White cannot be considered qualified in this matter, as he lacks

both an understanding of circuitry and legal experience. (Doc. 185 at 6-7.) Bradley asserts that

"White admits to deferring to Electrical Engineers for matters involving circuitry" and he "admits

to conducting no inspection, examination and/or investigation into the electrical circuitry" of the

battery. (*Id.* at 8.) He finds White's conclusion, that circuitry of the battery was not the cause of

the malfunction because "it worked for eight months and therefore could not have been the reason

for the spontaneous combustion," deficient. (*Id.* at 9.)   Further, Plaintiff highlights that White has

had "limited experience in the legal venue," as he has only participated in only three depositions

and one arbitration, which contributes to him being unqualified. (*Id.*)

In its response, Defendant deems White a fully qualified expert on lithium-ion batteries. (Doc.

205 at 8.) Regarding circuitry, Defendant contends Plaintiff "inaccurately minimizes Dr. White's

education and extensive experience with the precise type of product at issue here." (*Id.*)

Defendant contends that the purported deficiencies regarding White's conclusion about the

battery's circuitry "ignores Dr. White's testimony that he considered and was able to rule out the

charger's circuitry as the cause of the thermal runaway because 'it worked great for eight months

prior to the incident.'" (*Id.* at 10.) Amazon contends that the argument that White is unqualified because he lacks legal experience is of little merit, as he "work[ed] with non-litigation clients to identify and resolve battery problems" rather than engaging in litigation. (*Id.*) By way of example, his team examines 50-100 lithium-ion battery failures per year. (*Id.*)

We are unpersuaded by Bradley's arguments. We do not accept Bradley's proposition that Dr. White is not qualified to opine on cause of the Product's malfunction. White has a bachelor's degree in chemistry and a Ph.D. in electrochemistry. (Doc. 205-6, Def. Ex. E, at 2.)   He has been working for over 20 years with batteries, including, as is most relevant here, lithium-ion batteries. (*Id.* at 2-5.) He has authored over 30 publications related to battery chemistry and holds "three patents related to battery science." (*Id.*) Without question, White "possess[es] specialized expertise" in electrochemistry and battery science. *Schneider,* 320 F.3d at 404. Accordingly, White is qualified in this specialty.

### ii. Reliability

Second, Bradley argues White's findings and methodologies are unreliable. (Doc. 185 at 10.) Specifically, Plaintiff alleges White's conclusion that mechanical abuse caused the Product to malfunction is premised on "no scientific or testing to support the severity of abuse required to cause a thermal runaway." (*Id.*) In coming to his conclusion, "Dr. White negligently and/or intentionally disregards very compelling evidence that electrical circuitry was likely the cause of the thermal runaway." (*Id.*) Plaintiff claims that, allegedly, the "separator…is/was the initiation location of the thermal runaway" and asserts that White's conclusion that the Product underwent

mechanical abuse is "uncorroborated" and ignores "the burned-up separator at the location where the thermal runaway initiated." (*Id*.) Accordingly, Plaintiff accuses Dr. White of "disregard[ing] the record of evidence and mak[ing]-up and/or fabricat[ing] evidence that does not exist." (*Id*. at 11.)

In response, Defendants argue White's methodology is wholly reliable. (Doc. 205 at 11.) He applied the scientific method in coming to his conclusion. (*Id*. at 12.) He examined the exemplar device with "sophisticated tools" and engaged in a process of elimination to determine if design or manufacturing defect, thermal abuse from external heat source, or electrical abuse caused thermal runaway event. (*Id*.)

Upon our review of White's report, we find that Bradley's reliability argument lacks merit. Bradley avers that because White concluded it is "impossible to definitively determine the root cause for the thermal runaway event in the Charger," his opinion is intentionally misleading and speculative. (Doc. 205-3, Def. Ex. B, at 17.) We disagree. We decline to accept that White's theory of causation, that the Charger underwent mechanical abuse, is "uncorroborated." Experts commonly testify as to the "most likely" cause of some event, and it is permissible for them to do so long as that opinion rests on "good grounds." *See, e.g.*, *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154 (3d Cir. 1999). This is particularly true in the scenario of defense causation experts proffered to counter a plaintiff's causation theory. *See Holbrook*, 80 F.3d at 786; *see also St. Paul Fire & Marine Ins. Co.*, 2005 WL 1168380, at *11.

As to Dr. White's methodology, he "conducted an examination of the Charger remains with

non-destructive techniques that included visual inspection with photo-documentation and computed tomography X-ray imaging (CT) of the Charger remains." (Doc. 205-3, Def. Ex. B, at 7.) Then "[t]he information gathered non-destructively was used to direct subsequent destructive analysis techniques…[] that included an agreed-upon disassembly of the Charger remains, visual inspection, photo-documentation, reflected light microscopy, scanning electron microscopy, and energy dispersive spectroscopy." (*Id*.)

The destructive analysis led to White concluding that the "single spirally-wound lithium-ion pouch cell of the Charger experienced a thermal runaway." (Doc. 205-3, Def. Ex. B at 14.)   He explained that there are "four general ways to accomplish a thermal runaway initiation:" external heating, electrical abuse, mechanical abuse, and manufacturing defects and found that "the available evidence was sufficient to eliminate all causes except mechanical abuse." (*Id*. at 13.) In a step by step process, White was able to eliminate external heating, electrical abuse, and manufacturing defects as the cause of the thermal runaway, leaving only mechanical abuse as the cause. (*Id.* at 16-17.)

White claims that his inability to definitively identify the root cause of the thermal runaway may be through no fault of his own. He states that "exact location of the initiation point could not be identified because a large portion of the outermost wraps of the negative electrode, most likely to contain the initiation point, was torn from the remaining electrode and not available for inspection." (*Id.* at 14.) The "wrinkling and tearing of the remaining electrode" "can only be explained by the handling of evidence by an individual with little to no experience examining

23

damaged lithium-ion battery remains" and White points to images provided by Bradley that the Product had been "disassembled" by the Plaintiff's expert. (*Id.*)

Nevertheless, Dr. White asserts that "[d]espite the damaged condition of the Charger that the time of [his] inspection, [he] was able to make certain observations in support of the hypothesis that an external mechanical force acted upon the battery cell of the Charger" and caused the thermal runaway. (*Id.* at 15.)   He continues on that:

> [w]hile the damaged condition of the available evidence and the absence of important parts of the surviving electrode assembly make it impossible to definitively determine the root cause for the thermal runaway event in the Charger, the fact that the damage patterns become less severe with increasing depth into the cell, and the evidence of the cell becoming the hottest in the outer wraps, clearly put the origin of the thermal runaway event at or near the outer surface of the electrode assembly, a region that would be most susceptible to mechanical impact.

(*Id.* at 17.) He ultimately concludes that a "determination of root cause is not supported by the evidence because the available evidence was damaged by improper handling after the thermal runaway event, but prior to his examination." (*Id.* at 27.) However, "one cannot reasonably eliminate the possibility that some external mechanical force acted upon the Charger." (*Id.* at 29.)

It cannot be said that White's opinion is simply based on "subjective belief or unsupported speculation" when he thoroughly explains his methodology and reasoning for eliminating potential causes of the thermal runaway except mechanical abuse. *Paoli*, 35 F.3d at 744. "The standard for reliability is 'not that high,'" and White clears this hurdle by his examination method and subsequent analysis. *Karlo*, 849 F.3d at 81 (quoting *TMI*, 193 F.3d at 665). As to Plaintiff's assertion that White ignored "very compelling evidence" that electrical circuitry was

24

the cause of the thermal runaway, and not mechanical force, we are reminded that "[a]s long as an expert's scientific testimony rests upon good grounds it should be tested by the adversary process." *Mitchell*, 365 F.3d at 234. It is for a jury to decide which expert, and subsequently which theory of causation, they find most credible. We therefore conclude, in accordance with the liberal admissibility standards embodied in Fed.R.Evid. 702, that White has "good grounds" for his opinion which could be seriously tested by the adversarial process. *Karlo*, 849 F.3d at 81.

### iii.  Relevance

Finally, Plaintiff argues White's opinions "are not relevant or probative of any issue in this case" and that his opinions are highly prejudicial because he "introduce[s] facts or inferences not otherwise provided for in the records, such as Plaintiff having caused some mechanical abuse to the phone and/or someone with access to the Plaintiff's phone having caused abuse."[10] (Doc. 185 at 12.) Plaintiff accuses Defendants of "essentially introduc[ing] White to blame Plaintiff and/or Plaintiff's damages [sic] iPhone as having caused the thermal runaway/spontaneously combusting

---

[10]  Bradley argues in this section of his brief that "the prejudice to Plaintiff far outweighs the probative value" of Dr. Whites's testimony. (Doc. 185 at 12.) To the extent that Bradley implicitly challenges the admissibility of White's opinion under Fed.R.Evid. 403, we reject that argument as well. That rule permits the Court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of," inter alia, "confusing the issues [and] misleading the jury." Fed.R.Evid. 403. We find that White's testimony has high probative value and only a small risk of confusing the issues or misleading the jury. Bradley's argument that White's opinion is incomplete or inaccurate can be alleviated through effective cross-examination. *See, e.g.*, *Mitchell*, 365 F.3d at 234 (reliable testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.").

Charger." (*Id.*) In response, Amazon argues White's opinion is relevant and not prejudicial. (Doc. 205 at 16.) White's "opinions address factual disputes that are of consequence in determining this action, including the cause of the thermal runaway, and will aid the jury in resolving those disputes." (*Id.*)

We are not persuaded by Plaintiff's argument. White's opinion on the cause of the thermal runaway is "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute" because the cause of the Product's malfunction is directly at issue. *Schiff*, 602 F.3d at 173. He points to three observations to support his conclusion that an external mechanical force was the cause of the thermal runaway:

- Damage patterns on the surviving negative electrode were most severe in the outer wraps of the cell, with diminishing severity toward the inner wraps, indicating that the likely point of origin for the thermal runaway event was at or near the outer surface of the electrode assembly.

- The graphite active material coated on the copper negative electrode current collector was consumed by the heat of the thermal runaway event was only on the outermost wraps, further supporting that the origin of the event was at or near the outer surface of the electrode assembly.

- According to deposition testimony (J. Bradley, L. Henriques), the Charger operated normally, without signs of thermal instability, for up to 20 charge-discharge cycles over a period of approximately eight months prior to the thermal event.

(Doc. 205-3, Def. Ex. B, at 16.) On the last point, White opines "it is uncharacteristic and highly unlikely for a battery pack (like the Charger) that has been in service, without incident, to develop an internal fault (short circuit) related to a defective manufacturing or

design that is capable of initiating thermal runaway." (*Id.*) Accordingly, we decline to accept Plaintiff's contention that White "introduce[s] facts or inferences not otherwise provided for in the records." (Doc. 185 at 12.) We are reminded that "[the fit requirement] is a question of relevance, and Rule 702 has a liberal policy of admissibility if [expert testimony] has the potential for assisting the trier of fact." *Schiff*, 602 F.3d at 173 (internal citations and quotations omitted). White's opinion will assist the jury in determining causation, and as such, it meets the "fit" requirement. For the foregoing reasons, Bradley's motion to preclude Kevin C. White, Ph.D. from testifying is denied.

### C. Amazon's "motion to strike the July 15, 2022 Expert Report of Neil Shirk" (Doc. 182)

Bradley offers Shirk as an expert to rebut Dr. White's report. Amazon seeks to strike Shirk's expert report on two bases. First, Amazon claims that Shirk's report exceeds the permissible scope of a "rebuttal" report, as it offers previously undisclosed affirmative expert opinions on the issue of causation. Second, Amazon claims that Shirk's report is untimely, as Plaintiff was required to disclose his affirmative expert opinions by May 9, 2022. On August 4, 2022, we held an unrecorded telephone conference with the parties to discuss Amazon's objections, after which we ordered Amazon to file a formal motion to strike by August 10, 2022, and Bradley to respond by August 12, 2022.[11](Doc. 181.)

---

[11] Amazon filed a reply to Bradley's response on August 12, 2022. (Doc. 184.) Bradley subsequently contacted the Court via email to object to Amazon's filing, on the basis that we did not request a reply in our scheduling order for this motion. Given that Amazon's reply reiterates

Amazon argues that Shirk's report should be stricken because it is not a "rebuttal" report, as it "offers new and untimely opinions and theories relating to defect and causation." (Doc. 182-1 at 7.) Amazon points to portions of Shirk's report where he opines that, if "an over-current/short circuit/over-charge/over-discharge" happened, then the Product should have "cut off its energy output automatically and enter[ed] the Protection Mode to prevent damage[.]" (*Id.* at 7-8) (citing Doc. 182-5, Def. Ex. D, at 6.) Shirk claims that the Product in this case "was defective as the Protection Mode failed to function as advertised, and the defective components and/or poorly designed battery cover/case and housing were insufficient to protect the battery from self-heating and starting the fire." (*Id.*) (citing Doc. 182-5, Def. Ex. D, at 9.) Shirk theorizes that these "conditions of failed battery, failed circuit component, or lack of battery protection case, or failed protection mode" are the specific manufacturing defects that caused the Product to ignite and harm Bradley. (*Id.*) Amazon contends that neither Panunto nor Smullin identified "a single manufacturing or design defect in the charger," and that neither expert attributed the cause of Bradley's injury to a failed operation of the "Protection Mode" of the Product.[12] (*Id.* at 8) (citing

_____

many of the arguments from its initial motion, is relatively short in length, and was submitted in a timely manner—almost immediately after Bradley's response—we are comfortable considering Amazon's reply in our resolution of this motion, despite the fact we did not order its submission. Even if Amazon had not file a reply, we would have come to the same conclusion based upon the arguments raised in Amazon's motion.

[12] In its motion to strike, Amazon does not use the defined term "Charger" to refer to the Product and instead uses the undefined word charger. (*See* Doc. 182-1.)

Doc. 182-2, Def. Ex. A; Doc. 182-3, Def. Ex. B; Doc. 182-4, Def. Ex. C, Smullin Dep.).

Amazon also argues that Shirk's report offers opinions and conclusions beyond the scope of White's report, as White also did not identify these defects, nor did he attribute the cause of the incident to "the failure of the charger's self-protection fail-safe self-destruction mode."[13] (*Id*. at 9.)

Bradley asserts that Shirk's opinions "are not new or contradictory, but appropriately rebut" the opinions of White and expand on the opinions of Panunto and Smullin. (Doc. 183 at 6.) Panunto concluded the malfunction was "most likely started by shorting of some of the copper plates or by degradation of the lithium jell leading to thermal runaway" and Bradley claims that that this opinion "tie[s] in" to Shirk's conclusion that the cause of the incident was "likely a defect in the battery material or other electronic components [...and] that the Protective Mode was not working, or the incident would not have occurred." (*Id*. at 8.)

---

[13] Additionally, Amazon claims that, "Shirk also opines, for the first time, that the failure of the charger's self-protection fail-safe self-destruction mode was the same type of manufacturing defect which occurred in both the David Jarrett & Vincent Farace Incidents." (Doc. 182-1 at 9) (internal citations omitted.) Amazon asserts that White did not opine on these incidents and that although Smullin mentioned them in his report, "he did not reach any conclusions as to whether there existed a defect" in those cases. (*Id*.) We agree with Amazon that this opinion by Shirk is beyond the scope of both White and Smullin's reports. First, White did not refer to these incidents in his report. (White Rep., June 24, 2022.) Second, Smullin only recounted the facts of these incidents; he did not identify any defects or theories of causation relevant to these incidents. (Doc. 182-3, Def. Ex. B, at 7-8.) Even Bradley admits in his briefing that Shirk's opinions on this point "appear to be a reach." (Doc. 183 at 10.) Accordingly, we are satisfied that these portions of Shirk's report are not proper for "rebuttal" purposes.

Upon our evaluation of the relevant reports, we are not convinced that Shirk's "rebuttal" report properly refutes or builds upon Plaintiff's other experts' theories. Panunto and Shirk's opinions do not appear to "tie in" to one another. Rather, they seem to attribute two completely different causes to the Product's malfunction. Further, Bradley's other expert, Smullin, admitted in his deposition that he did not find any "evidence of a design of manufacturing defect" following his examination of the Product. (Doc. 182-4, Def. Ex. C, Smullin Dep. 144:20-24, 160:15-22.) Although both Panunto and Smullin make general reference to the fact Defendants "failed to design and include protective features and devices to preclude injury" and that "Defendants failed to provide the product [...] with a functioning feature offering protection from failing catastrophically under normal use," neither of them specifically ascribe the source of its malfunction to the failure of the Product's "Protection Mode."[14] (Doc. 182-2, Ex. A, at 7; Doc. 182-3, Ex. B, at 11.) Bradley himself admits that Shirk's elaboration is different than his previous experts' review. (Doc. 183 at 7, 8.) We are satisfied that Shirk does not expand on the opinions established by Panunto or Smullin, and that he offers "new opinions or information" that are sometimes "contradictory to their initial disclosures." *Fulton Fin. Advisors*, 2016 WL 5461897, at *2.

---

[14] We note that in Smullin's report, he references the Product's "Protection Mode" when recounting his investigation of the incident and his review of the charger itself: "Instructions do mention, they actually flaunt, the implication that POWERBANK is self-protected or fail-safe […] 'Why did my ICHOC-5000 enter Protection Mode?'" (Doc. 182-3, Def. Ex. B, at 6.)  Smullin does not, however, offer further discussion as to the function or purpose of the Product's "Protection Mode," nor does he expressly attribute the Product's malfunction to the failure of the "Protection Mode." Panunto does not reference the Product's "Protection Mode" at all in his report. (Doc. 182-2, Def. Ex. A.)

We acknowledge that certain portions of Shirk's report appear to refute the methodologies and conclusions in White's report. (Doc. 182-5, Def. Ex. D, at 5-10.) Shirk rebuts White's findings on the basis that White's "core discipline is chemistry," and that his "opinions are based on unsupported assumptions and maybes." (*Id*. at 6.) Specifically, Shirk claims that White's "findings and opinions are not reasonable," as White excluded the possibility of a manufacturing defect as the cause of the incident and instead hypothesized that an external force caused the Product to malfunction. (*Id*. at 7-8.) Shirk asserts that White "offers no data to back-up his assumptions" and concluded that "the damages [sic] condition of the charger makes it impossible to definitively determine the root cause for the thermal runaway." (*Id*. at 8.) We agree with Amazon that these "rebuttals" are actually "critiques of [White's] qualification and methodology" and therefore "more appropriate for a *Daubert* motion, cross-examination, and/or argument—but not a rebuttal expert report." (Doc. 184 at 2.) Further, we emphasize that Shirk's report fails to "contradict or rebut evidence on the same subject matter identified" by White, as Shirk posits that the Product was defective, which is beyond the scope of White's finding that the Product was damaged.[15] *In*

---

[15] Bradley claims that the following excerpt from Shirk's opinion is a proper rebuttal, as it is a "direct response to [White's] opinion about mechanical abuse" causing the Product's malfunction:

> Even if Dr. White is correct with his theory of a mysterious unknown mechanical hit or drop of the battery charger with no knowledge or record of that ever occurring to this portable battery charger, his finding is still a manufacturing defect. Manufacturing of Easy ACC failed to properly protect the battery with the case that can protect and absorb small shock and pressures without self-ignition.

*re Asbestos Prod. Liab. Litig.* (No. VI), 2012 WL 661673, at \*1. Accordingly, we conclude that Shirk's report offers new theories of defect and causation beyond those presented by Amazon's expert, White, or by Plaintiff's experts, Panunto and Smullin.

Finding that that Shirk's report is not a proper rebuttal report, and is instead an affirmative expert report, we find that it is untimely and not in compliance with Federal Rule of Civil Procedure 26. Under Rule 26, Bradley was obligated to produce information about its affirmative experts, including its expert reports, no later than May 9, 2022. (Doc. 170.) Under Federal Rule of Civil Procedure 37, Bradley is not permitted to use Shirk's report unless his failure to disclose Shirk's information "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In weighing the relevant five factors set forth by the Third Circuit, we conclude striking Shirk's report is warranted. *See ZF Meritor, LLC*, 696 F.3d at 298. First, Bradley prejudiced Amazon by presenting new theories of causation and defect with only two weeks left in expert discovery, thereby depriving Amazon of the opportunity to depose and otherwise examine Shirk's opinions. Second, under the current scheduling order, this prejudice cannot be cured, as "all expert discovery, including the depositions of expert witnesses," closed on August 8, 2022, and, at the time this motion was filed, the parties were the process of preparing *Daubert* motions and motions

---

(Doc. 183 at 9); (Doc. 182-5, Def. Ex. D, at 8.) This statement is not a rebuttal of White's opinion. Rather, Shirk mischaracterizes White's findings by asserting that even if the Product had been dropped, it would not have been damaged unless it was defective. Shirk not only manipulates White's conclusions to "fit" into his own theory of causation, but in doing so, he also impermissibly introduces yet another "new" theory of defect.

for summary judgment, which were due on August 26, 2022. (Doc. 179.)

Third, allowing Shirk's report would "disrupt the orderly and efficient" litigation process, as the Court would need to reopen discovery. *ZF Meritor, LLC*, 696 F.3d at 298. *See Mente Chevrolet Oldsmobile Inc. v. GMAC*, 728 F. Supp. 2d 662, 679 (E.D. Pa. 2010), *aff'd*, 451 F. App'x 214 (3d Cir. 2011). We note that the expert discovery deadline has already been extended on six different occasions. (Docs. 57, 94, 120, 144, 160, 170.) Fourth, critically, Bradley fails to offer any reason for his noncompliance with the deadlines and requirements set out by our scheduling order and by Federal Rule of Evidence 26, other than it "totally disagrees" that Shirk's report exceeds the scope of proper rebuttal. (Doc. 182-1 at 10.) We will not allow Bradley's non-compliance to delay this litigation any further.

Finally, we are not convinced that this evidence is so "important" to Plaintiff's case that an extension of deadlines would be warranted, especially when we consider that Plaintiff has already disclosed two causation experts in support of its case, Panunto and Smullin.[16] Further, as we have said, Shirk offers theories of defect and causation that actually contradict those presented by its other experts; Shirk's report would likely only serve to confuse or mislead the jury by introducing

---

[16] Amazon noted that "[Panunto] passed away before any party was afforded the opportunity to depose him, and thus, his exact opinions are unknown." (Doc. 184 at 1.) Despite the unfortunate fact that Bradley is likely disadvantaged by the passing of one of his experts, Plaintiff made no argument on this point in its briefing. Even if that argument had been raised, we emphasize again that Panunto and Shirk offer different theories of defect and causation as to the Product's explosion. Thus, even in the absence of Panunto's deposition and trial testimony, Shirk cannot serve to expand upon or otherwise supplement Panunto's opinions.

conflicting evidence. *See* Fed. R. Evid. 403

For the reasons set out above, we find that Shirk's report impermissibly offers new, affirmative expert opinion beyond that which was offered by White, Panunto, or Smullin. In applying the factors set out by the Third Circuit governing the exclusion of undisclosed evidence, we conclude that Shirk's report should be stricken. Plaintiff will be precluded from relying upon Shirk's report in any motion, hearing, or trial of this case.[17]

### D.  Amazon's "motion to exclude Neil Shirk" (Doc. 195)

We need not address the merits of Amazon's arguments to exclude Shirk, seeing as we have granted Amazon's motion to strike Shirk's report. We reiterate that Plaintiff will be precluded from relying upon Shirk's report in any motion, hearing, or trial of this case.

### E.  Amazon's letter brief to strike the Shirk Supplemental Report

On September 2, 2022, Amazon was served with the Shirk Supplemental Report, which included additional analysis and opinions about the cause of the incident. (September 28, 2022 Undocketed Letter to the Court.) On September 6, 2022, Amazon notified this Court of its intent

---

[17]  We are aware that Bradley, "by and through his counsel request[ed] oral argument on record on all issues presented." (Doc. 183 at 11.) Upon our review of the relevant reports and the legal arguments presented in the briefing, and in light of our decision to strike Shirk's report, Bradley's request is denied as moot. We are also aware that Amazon "respectfully requests leave to file a separate motion to seek its costs in drafting and filing this motion and, if applicable, its costs in the preparation for and completion of [Shirk's] deposition and the drafting and filing of a *Daubert* motion to exclude [Shirk's] opinions and testimony." (Doc. 182-1 at 2.) We will permit Amazon to file a motion for appropriate expenses.

to strike the Shirk Supplemental Report and we held an unrecorded telephonic conference on the matter. (Doc. 207.) The Court asked Amazon to submit supplemental briefing outlining its position as to why the Shirk Supplemental Report should be excluded. (Doc. 207) It did so, and Bradley responded in opposition thereto.[18] (Doc. 214.)

Seeing as we have granted Amazon's motion to strike the Shirk report, finding that the report was both untimely and prejudicial to Amazon, we also grant Amazon's motion to strike the Shirk Supplemental Report on the same grounds. *See* Discussion *supra* Part III.C. Plaintiff will be precluded from relying upon the Shirk's Supplemental Report in any motion, hearing, or trial of this case.

### F.  Amazon's "motion to exclude Mark Willingham" (Doc. 191)

Plaintiff offers Willingham as an expert in the modeling and fashion industry. He opines on Bradley's potential lost wages in the modeling industry and concludes that the severe scarring Plaintiff suffered as a result of the Product's alleged malfunction precluded him from a top career in modeling. Amazon argues that Willingham's opinions are (1) "not based on sufficient facts and data and are not the product of any reliable methodology" and (2) he has "no experience or qualifications that support his speculation about Plaintiff's earning potential." (Doc. 191-1 at 10, 12.)

### i.  Qualification

---

[18] These letters were not docketed and instead were submitted to the Court via email. They are docketed contemporaneous with the filing of this memorandum opinion.

Amazon asserts Willingham is not qualified to opine on Bradley's earning potential because Willingham's experience is in marketing and brand strategy. (*Id.* at 13.) In performing his marketing and brand strategy duties, he only "intersected with the modeling industry in a purely ancillary fashion" which gave him merely "general knowledge about the business workings of that industry." (*Id.*)   Amazon argues that Willingham, therefore, does not possess the specific expertise required to determine Plaintiff's "hypothetical earning potential" in the modeling industry. (*Id.*) Defendant highlights the fact that although Willingham alleges he has worked with female models, he admittedly has "never worked with male models, let alone male underwear and swimwear models," which is, as Defendant purports, critical in determining income potential. (*Id.* at 15-16.)

In response, Bradley highlights that Willingham has worked in "the fashion and modeling industries since 2006." (Doc. 198-1, Pl. Ex. A, at 2.) He has experience "both as a client booking models and as the founder of a talent booking platform." (*Id.*) In his experience booking models, Willingham explained the models chosen were "selected based on a broad range of criteria including the look and/or talent requirements specific to each job." (*Id.*)   In regard to paying models, Willingham explained that model compensation has "always been dependent on how important it was for us to have each specific model, based on who they were or their unique look, and the level of demand by other companies and brands for that model." (*Id.*)

Willingham opines that, in the modeling industry, "the main obstacles to success are 1) the model's tenacity, and 2) the alignment between the model's talent and look that which is being

36

sought by the client." (*Id*. at 3.) He notes that underwear and swimsuit models are held to "a higher standard of fitness and skin perfection" (*Id*.) (internal quotations omitted.) Willingham ultimately concluded that despite Bradley's "tenacity," his scar could prevent him from being booked for modeling jobs. (*Id*.)

Although we find this determination to be a close call, we find that Willingham is qualified under the liberal standard for qualification. Indeed, while an expert must possess "specialized expertise" to be qualified, this requirement has been "interpreted liberally," with the Third Circuit holding that "a broad range of knowledge, skills, and training qualify an expert." *Paoli*, 35 F.3d at 741. Despite its liberal construction of the qualification requirement, the Third Circuit has "not pursued a policy of qualifying *any* proffered witness as an expert." *Waldorf,* 142 F.3d at 625. Rather, "at a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman." *Id.* (internal citations, quotations, and alterations omitted). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril*, 128 F.3d at 809.

Willingham has worked in the fashion and modeling industry for more than 15 years. He has experience booking models and founded a booking platform where companies can hire models. We acknowledge, as Amazon emphasizes in its motion, that Willingham himself never has modeled, has never worked as a modeling agent, and has never negotiated a contract on behalf of a model. (Doc. 191-1 at 13.) However, his career has provided him "skill or knowledge greater than the average layman" when it comes to the modeling industry, and, therefore, we find

Willingham to be qualified. *Waldorf,* 142 F.3d at 625. Although there may well exist experts

with more specific experience in male modeling salaries, we are reminded that "it is an abuse of

discretion to exclude testimony simply because . . . the proposed expert does not have the

specialization that the court considers most appropriate." *Holbrook*, 80 F.3d at 782. Accordingly,

we conclude that Willingham "meets liberal minimum qualifications." *Kannankeril*, 128 F.3d at

809. As such, concern as to "the level of [his] expertise goes to credibility and weight, not

admissibility." *Id.*

### ii.   Reliability

Amazon argues Willingham "has no data or analysis to support this claim that Plaintiff's

scar prevents him from earning $500,000 to $2,000,000 as a model. He simply assumes, with no

supporting data, that (1) Plaintiff would have been a model, (2) his scar precludes him from

being one, (3) and he would have made $500,000 to $2,000,000 for about ten years." (Doc. 191-

1 at 10-11.) As a threshold matter, Amazon argues Willingham's opinion is speculative because

Bradley has not made a "meaningful attempt to break into the [modeling] industry," yet

Willingham opines on potential lost income as if he were already a top model. (*Id*. at 2.)

Bradley has "no prior professional modeling experience – other than a few David's Bridal

events as a teenager" and has made "no effort to pursue that career for nearly a decade."[19] (*Id*.)

Nonetheless, Willingham takes income range for top male models from a Forbes article from

_____

[19] Bradley was in his early twenties at the time of the incident.

2013 and applies it to Bradley. (*Id.* at 11.) That income range includes ancillary activities, like speaking engagements, but he could "not say Plaintiff could have secured any of these ancillary revenue sources but for the scar." (*Id.*) Willingham did not include average male model income or consider the average male model income in coming to his lost income conclusion. (*Id.*)

In response, Plaintiff argues Willingham is qualified as an expert to testify in this matter because he is an industry professional who "has had direct involvement in evaluating models for photo shoots, runway shows, special events, and other promotional purposes." (Doc. 198 at 2.) In coming to his opinion on Bradley's earning potential in the modeling industry, Bradley argues that Willingham did employ a method: he interviewed Plaintiff for "close to an hour," reviewed his portfolio and photographs from the litigation, and then relied on his years of experience in the industry in coming to a potential lost income estimate. (*Id.* at 2-3.) Further, Willingham relied on the IBISWorld Industry Report OD4468 in reaching his conclusions, which he described as "one of the most comprehensive reports on the industry." (*Id.* at 7) (citing Doc. 198-2, Pl. Ex. B, Willingham Dep. 17:10-13.)

Plaintiff explains that at the time of the injury, he was not seeking out modeling gigs because "he and his parents made an agreement that he would focus on his studies before returning to a career in modeling," but that, ultimately, he aspired to be a professional model. (Doc. 198 at 5.) Willingham opines that in his professional opinion, Bradley, "given his age and physique, had the potential to earn somewhere between $500,000 and $2,000,000 annually pursuing his dreams as a swimwear and underwear model for about 10 years had it not been for

his permanent scarring and disfigurement." (Doc. 198-1, Pl. Ex. A, at 3-4.) Willingham notes that, "in as far back as 2013, the top male models were earning anywhere from several hundred thousand dollars to well over one million dollars per year." (*Id.* at 4.) He found that Bradley "does not lack motivation and self confidence" which "sets him apart from many aspiring models that [Willingham] know[s]." (*Id.* at 3.)

In reply, Defendant argues Willingham fails to "answer the question of whether Plaintiff was actually going to be a top model." (Doc. 211 at 1.) Instead, Amazon alleges, Willingham "hedges" and opines that Bradley "could have ***potentially*** been a top model;" an opinion that Defendant asserts is not helpful to a jury. (*Id.* at 1, 3) (emphasis in original.) Willingham's "amorphous opinion would lead a jury speculating whether the scar on Plaintiff's leg actually prevented him from becoming a top model." (*Id.* at 4.) Accordingly, because he cannot say definitively he would have been a top model, "he talks in possibilities, which is not helpful to the jury." (*Id.* at 5.)

Again, although we find this determination to be a close call, we find that Willingham's opinion is reliable under the liberal standard for reliability. Given the nature of Willingham's opinion, we find that his knowledge of the industry, review of applicable literature, and discussion with Bradley are "good grounds" for his testimony. Indeed, there is undoubtedly at least "*some* factual basis" for his testimony. *Stecyk*, 295 F.3d at 415 n.3 (holding that expert testimony was admissible "[b]ecause the record contains *some* factual basis—albeit shaky—for [the] testimony"). Bradley stated that he intended to pursue a career in modeling after college. Although the record does not support the contention that Bradley was actively looking for modeling jobs at the time of

the accident, it does support that Bradley wanted to model in the future. Willingham ultimately opines that Bradley had *potential* to be a top model. (emphasis added). Although we do not know if Bradley would have ever been a model, nor do we know had he pursued modeling how successful he would have been in that endeavor, that is a factual determination the jury can make after hearing competing damage experts.[20]

While Defendant makes valid points about that Willingham's methodology, we do not find the flaws in his analysis fatal to the admissibility of his opinion. Amazon emphasizes that Willingham fails to prove that Bradley would have been a model in the first place, let alone a top model, and that his scar precludes him from doing that. These challenges go to the weight of Willingham's opinions, not their admissibility. The extent and quality of Willingham's review can be probed on cross-examination. Defendants can highlight on cross-examination the logical jumps that Willingham made in coming to his conclusion, including, that (1) Bradley would have been a model, (2) the scar precludes him from being one and (3) he would have made $500,000 to $2,000,000 annually for a period of ten years being a top model. We are reminded that "[t]he standard for reliability is 'not that high.'" *Karlo*, 849 F.3d at 81 (quoting *TMI*, 193 F.3d at 665). It is "lower than merits standard of correctness," *id.*, but it is "higher than bare relevance." *Paoli*, 35 F.3d at 744. Accordingly, we conclude that there is a sufficient factual basis, albeit just barely, for Willingham's opinion—an opinion which we expect will be thoroughly explored on cross-

---

[20] Amazon has retained its own modeling expert, Ramon Lata. (Doc. 204-3 at 5.)

examination.[21] *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### G. Amazon's "motion to exclude Andrew Verzilli" (Doc. 189)

Plaintiff retained Andrew Verzilli, MBA, an economist, to opine on economic damages. Verzilli concludes that Plaintiff's economic damages are comprised of (1) lost earning potential over a ten-year period and (2) future medical costs, together totaling between $517,400 and $7,517,400. (Doc 189-3, Def. Ex. A.) Of that total economic damage, Verzilli categorizes $500,000 to $7,500,000 as lost earning capacity and $17,400 as future medical costs. (*Id.* at 5.) Amazon contends that Verzilli should be excluded because (1) his wage loss opinion is "not based on sufficient facts or data" and (2) his medical cost opinion "is not helpful to the jury." (Doc. 189-2 at 1, 3.)

### i. Wage Loss Opinion

Verzilli determines Plaintiff's lost earning capacity over a ten-year period to be $500,000 to $7,500,000. (Doc 189-3, Def. Ex. A at 5.) Defendant argues that this lost earning capacity opinion is problematic because Verzilli's conclusion is predicated upon Willingham's

---

[21] Despite Plaintiff's "tenacity," the Court has not been presented with evidence that, since the time of the accident, he has attempted to enter the modeling field. We expect his failure to mitigate to be a subject for cross-examination.

inadmissible opinion, and, therefore, Verzilli's conclusion is inadmissible.[22] (Doc. 189-2 at 3.)

Amazon argues that Verzilli relied upon Willingham's opinion in determining the range for Plaintiff's earning potential in the modeling industry. (*Id.* at 2.) Specifically, he used the lower end of the $500,000 to $2,000,000 range provided by Willingham and estimated that Plaintiff's pre-injury earning potential as a model to be in the range of $500,000 to $750,000 annually. (*Id.*) Verzilli then took the annual income range and applied it to a 10-year period to reach the total lost income range of $500,000 to $7,500,000.   (Doc 189-3, Ex. A.). Verzilli used the "lower end of the range" to be more conservative in his calculations. (Doc 189-3 ,Def. Ex. A, at 3.)

In his response, Plaintiff contends that Verzilli conducted a "forensic examination" of Plaintiff and came to its lost earning potential figure by evaluating Plaintiff's "education, background, past employment history, and the report of Mr. Willingham." (Doc. 197 at 4.) Accordingly, based on the examination, "as well as inflation, interest, life expectancy and other economic variables," Verzilli's total damages amounted to $517,400 to $7,517,400. (*Id.*)

Verzilli calculates the economic damages by "[u]tilizing 1) Julian Bradley's background, 2) economic principles, and 3) the opinion of Mr. Willingham." (Doc 189-3 ,Def. Ex. A, at 3.) The ten-year duration of the estimate is based on Willingham's opinion ***as to*** the number of years Bradley could have been a model. (*Id.* at 4.) Verzilli asserts "[t]his methodology is consistent with PA damage horizons guidelines, in which earning capacity is to consider the individual's

---

[22] Verzilli concedes that his calculations were based, in part, on Willingham's conclusions. (Doc 189-3, Def. Ex. A, at 3.)

43

"economic horizons." (*Id*.) Verzilli notes that Bradley worked "in sales, with Cutco Vector Marketing" and was "one of the top sales persons and also had management responsibilities." (*Id.* at 3.)   In addition to working at Cutco Vector Marketing, Verzilli provides that Bradley worked in financial planning, established his own business, and "does real estate investing and flips houses."[23]  (*Id*.)

We are not persuaded by Defendant's argument. We found Willingham's opinion to be admissible, albeit barely. Accordingly, Defendant's argument, that the underlying basis for Verzilli's opinion is not found in the factual record, is moot. *See* Section III.C. We find that Verzilli's opinion as to wage loss just meets the liberal reliability requirement under 702. His wage loss opinion encompasses only what Bradley's potential earning would have been in the modeling industry. Problematically, Verzilli does not consider the expenses which would be required for Bradley to pursue a career in modeling. [24]

However, ultimately Verzilli takes the income range set forth by Willingham, applies "economic principles," and narrows the lost income range as result. In determining whether to admit expert testimony, we do "not weigh the evidence relied upon or determine whether it agrees

---

[23] Verzilli does not provide income figures for Bradley's employment at Cutco, his financial planning, or entrepreneurial ventures. (Doc 189-3 ,Def. Ex. A.)

[24] There are glaring deficiencies in Verzilli's analysis, which we anticipate will be substantially probed on cross examination. He neither considers the expenses which Bradley would incur pursuing a modeling career, nor does he explain the availability of work assignments in the modeling industry. Verzilli does not comment upon, or take into consideration, Bradley's prior employment and compensation history at Cutco or financial planning; his analysis focuses solely upon potential lost wages in the modeling industry.

with the conclusions reached therein." *Walker,* 46 Fed.Appx. at 695. Rather, "the credibility and weight of [the expert] testimony is to be determined by the jury, not the trial judge." *Id.* (internal citation and quotations omitted). We keep in mind that "[t]he standard for reliability is 'not that high.'" *Karlo,* 849 F.3d at 81 (quoting *TMI,* 193 F.3d at 665). It is "lower than merits standard of correctness," *id.*, but it is "higher than bare relevance." *Paoli,* 35 F.3d at 744. The accuracy of Verzilli's opinion and his underlying assumptions may be probed on cross examination.

### ii. Medical Cost Opinion

Verzilli estimates Bradley's future medical costs to be $17,400. (Doc 189-3, Def. Ex. A, at 5.) Defendant argues that this figure comes directly a letter by Dr. Aaron Shapiro, in which Dr. Shapiro states that Plaintiff's scar could improve from six laser resurfacing treatments, at $2000 per treatment, and three years of pigment gel, costing $150 per month. (Doc. 189-4, Def. Ex. B) Defendant asserts that all Verzilli did was do "simple" math to add up the two different medical costs Dr. Shapiro laid out in his letter, which totaled $17,400. (Doc. 189-2 at 3.). Amazon argues that Verzilli's opinion is "unadorned with the sort of calculations one normally expects an economist to perform." (*Id*. at 2.)   In response, Plaintiff argues that Verzilli is qualified and that his opinion is reliable. (Doc. 197 at 4-6.)

We agree with Defendants that Verzilli's medical cost opinion is not helpful to the jury. Courts have consistently excluded expert opinions which offer calculations involving only "simple math." *See Triad Cap. Mgmt., LLC v. Priv. Equity Cap. Corp*, 2010 WL 10076450, at *3 (N.D. Ill. Nov. 22, 2010) (excluding expert testimony where the expert merely added eight line-

items of expenses because "a jury can do simple math and read."); *Master–Halco, Inc. v. Scillia,*

*Dowling & Natarelli, LLC, et al.,* 2010 WL 2978289, at *3,*5 (D.Conn. Apr. 9, 2010) ("There is

absolutely no reason why the jury cannot do [addition and multiplication] for itself; in fact, juries

do these types of calculations all the time.").  We find no need for Verzilli to multiply the cost of

a medical treatment times the number of treatments; a jury is capable of doing that for

themselves. Accordingly, Verzilli is barred from offering an opinion on medical costs.

### IV.    CONCLUSION

For the reasons set out herein, we have determined, in light of the liberal standards of

admissibility embodied in Federal Rule of Evidence 702, that the parties' expert witnesses are

largely "qualified" and that their opinions are "reliable" and "fit" the facts of this case. Our

resolution of the motions addressed in this omnibus opinion is therefore consistent with the

directive that "rejection of expert testimony is the exception and not the rule." Fed.R.Evid. 702.

An appropriate order follows, setting out our specific resolution of each motion, consistent with

the determinations and reasoning discussed herein.